

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE APPLICATION OF RIVADA
NETWORKS PURSUANT TO 28 U.S.C. § 1782
TO CONDUCT DISCOVERY FOR USE IN
FOREIGN PROCEEDINGS.

Misc. Case No.  17MISC 41

**EX PARTE APPLICATION OF RIVADA NETWORKS FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 TO CONDUCT DISCOVERY FOR USE IN FOREIGN PROCEEDINGS**

1. Based upon the concurrently filed Declarations of John W. Moscow, Esq., and Javier Martin Gallardo Guzman, and the accompanying Memorandum of Law, Petitioner, Rivada Networks S. de R.L. de C.V. ("Rivada" or "Petitioner"), respectfully asks this Court to grant the Order annexed as Exhibit 10 to the Declaration of John W. Moscow, Esq., which grants Rivada leave, pursuant to 28 U.S.C. § 1782 and Rules 26 and 45 of the Federal Rules of Civil Procedure, to serve Bank of America and two of its New York-based employees with the subpoenas annexed as Exhibits 4 through 8 to the Declaration of John W. Moscow, Esq. The requested relief is for the purpose of obtaining discovery in connection with a pending civil action in Mexico (the "Constitutional Appeal") in addition to contemplated civil proceedings in Mexico (together with the Constitutional Appeal, the "Mexican Proceedings").

2. The subpoenas seek evidence for use in Rivada's pursuit of legal remedies in Mexico. Bank of America was a key participant in the Mexican telecommunications authority's ("SCT") issuance of the Red Compartida tender, in which SCT sought bids for a $7 billion telecommunications contract in Mexico. Bank of America had two roles in Red Compartida. First, Bank of America coordinated with domestic and international financial institutions to ensure the financial feasibility of Red Compartida. And second, Bank of America was contracted

by SCT to evaluate the bids submitted in response to the tender. Bank of America's engagement with SCT was spearheaded by Sonia Dulá and Luis Cantón out of New York. Bank of America, Ms. Dulá, and Mr. Cantón therefore possess evidence showing how Red Compartida was implemented and how the winning bidder was selected. As set forth in more detail below and in the accompanying Memorandum of Law, Petitioner seeks evidence from Bank of America, Ms. Dulá, and Mr. Cantón for use in the Mexican Proceedings to establish that the Mexican government's recent disqualification of Rivada's bid (and its selection of a competing bid) in its award of the nationwide $7 billion telecommunications contract were the products of collusion and were contrary to Mexican law.

### *Background Information Regarding the Bidding Process*

3.   In 2015, Mexico's Secretariat of Communications and Transportation ("SCT"), the Mexican federal entity that administers commercial road traffic and broadcasting, issued the "Red Compartida tender," which sought bids for the construction of a nationwide LTE telecommunications network in Mexico. Two bids were submitted for the estimated $7 billion contract: one from Rivada, a U.S.-based communications and technology business, the other from a consortium of U.S., Canadian, Mexican, and Chinese investors (the "Altan Consortium").

4.   The bidding process was initially set to close in July of 2016, but SCT delayed the close of bidding until November, over Rivada's objection and to the Altan Consortuim's benefit. At the time, the Mexican government told Rivada that the delay came at the request of certain development banks and that the development banks would treat all bidders on equal terms. It has since come to light, however, that the Mexican development banks with whom Bank of America interacted are indirect equity participants in the Altan Consortium (but not in Rivada).

5.    During the delay, Rivada officials sensed that they were under surveillance and took countermeasures in an attempt to ensure the integrity of their bid as well as the integrity of their people. One countermeasure was the hiring of security personnel to guard key employees. In addition, bid delivery boxes plainly marked as belonging to Rivada were hijacked on the streets of Mexico City on October 17, 2016, three days before the close of bidding. The boxes were empty, something the thieves only could have learned upon opening them. Following this, Rivada presented a complaint before Mexico City's Prosecutor on November 9, 2016. In the complaint Rivada stated that the boxes were hijacked from its employee, Maria Esther Ximena Flores Aranda.

6.    In the final three days before the bid submission deadline, the Mexican antitrust authority effectively barred Dish Network's participation in Rivada's consortium on very short notice. Specifically, the Federal Institute on Telecommunications (IFT), issued the antitrust clearance for the consortium members of Rivada and Altan on October 17, 2016, three days before the bid submission. The IFT limited Dish Network's participation in Rivada's consortium to 10% without voting rights, or board seats and imposing the sanction of losing the wholesale concession if for some reason Dish Network had influence on the network. In other words, the limits imposed by IFT effectively barred the participation of Dish in a very short notice before the bid submission deadline. And then, two days before the bid was due, Banamex – which was to deliver a $55 million letter of credit on Rivada's behalf, in connection with Rivada's bid – made new and unreasonable demands on Rivada as conditions for its issuance of the required letter. This was the first time that Banamex had raised the commercially unreasonable demands, even though Banamex and Rivada had been working on the letter of credit for the previous

3

month. Due to Banamex's new demands, Rivada was forced to submit its bid without Banamex's letter of credit, on October 20, 2016.

7. Rivada subsequently submitted a new letter of credit ten days after submitting its bid. Under Mexican law, the late submission of the letter of credit did not affect Rivada's solvency and was not sufficient grounds for disqualification of Rivada's bid. Nevertheless, SCT took the extraordinary step of disqualifying Rivada's bid on November 4 due to the late submission. Once Rivada's bid was disqualified, SCT selected the only remaining bid – the Altan Consortium bid – for the $7 billion Red Compartida contract. In violation of its own rules, SCT barred Rivada from attending the room where the award was announced on November 17, 2016.

8. Subsequent to these events, Rivada learned through credible sources that the Altan Consortium was improperly given access to a confidential series of documents prepared for SCT by Deloitte Consulting ("Deloitte"), together referred to as the "Business Model." The Business Model outlined the internal standards by which SCT was to judge the bids.[1] In fact, the Business Model was used as a "cheat sheet" for the Altan Consortium's preparation of its bid: the bid, Rivada has learned, was identical to the Business Model in multiple, critical respects. Rivada, of course, never had access to this confidential and highly sensitive document. The misappropriation of the Business Model (and the Altan Consortium's use of the Business Model as a blueprint for its bid) constitutes a clear violation of the integrity of the tender process as well as of Petitioner's right to a free, fair, and open competition in the Red Compartida tender. In

---

[1] SCT has characterized Deloitte's deliverables (which constitute what we refer to as the Business Model) as follows: "Highly specialized consulting services in technical, administrative, economic/financial and social profitability for the elaboration of inputs or elements for the tender rules and technical exhibits of the tender for the deployment and operation of the Red Compartida."

4

addition, Rivada has also learned that an official within SCT sought to rig the bidding process in favor of CVG, the predecessor to the Altan Consortium. That same official sought to award the contract to CVG even before SCT had decided to issue the Red Compartida tender, and subsequently sought to have the contract awarded to the Altan Consortium even before the bids were received.

### *Rivada has Obtained Evidence of Collusion in the Red Compartida Tender*

9. On December 5, 2016, Rivada filed two applications under § 1782 seeking to serve document and deposition subpoenas on Messrs. Brett Haan and Richard Keith, consultants who advised SCT in connection with Red Compartida. Through those § 1782 applications, Rivada sought to gather evidence of wrongdoing in the Red Compartida tender process for use in the Mexican Proceedings.[2] Rivada's applications were granted, and Mr. Haan was deposed in Washington, D.C. on December 20, 2016, while Mr. Keith was deposed the next day in Charleston, South Carolina.

10. At his deposition, Mr. Haan confirmed Rivada's belief that one of the Red Compartida bids had been improperly based on Deloitte's Business Model. Mr. Haan testified that during a conversation with Mr. Keith over dinner, Mr. Keith told him that "one of the bids was essentially a photocopy of our Deloitte work, and it was a 1 percent difference." Ex. 2, Haan Tr. at 49:5-7. When questioned about this thereafter, however, Mr. Keith testified that he could not recall whether he had told Mr. Haan that he had observed an overlap between the Business Model and a Red Compartida bid. Ex. 3, Keith Tr. at 18:14-15 ("I don't remember saying that in

---

[2] *See* In re Application of Rivada Networks, 2:16-mc-00473-DCN, ECF No. 1 (D.S.C. filed December 5, 2016); In re Application of Rivada Networks, 1:16-mc-00024-TSE-TCB, ECF No. 1 (E.D. Va. filed December 5, 2016). A third action was subsequently filed in the United States District Court for the Eastern District of Virginia, seeking documents from Deloitte Consulting. That application is still pending.

context, no."). Mr. Keith, who said he spent ten to twelve hours with counsel preparing to deny recollection of the events, suggested that the only way to determine whether such overlap existed was to compare the specific documents at issue. Ex. 3, Keith Tr. at 46:17-22; 21:23-22:3 ("[T]his is a relatively straightforward thing to resolve in the sense that, you know, if there is an external comparison needed to evaluate that, that a third party could easily come in and compare Deloitte's materials with an objective view against the other ....").

11. Mr. Haan's testimony yielded further indicia of misconduct in the Red Compartida tender process, beyond simply substantiating that the Altan Consortium bid was by and large a copy of the Business Model. Specifically, Mr. Haan testified that an official within SCT contacted him before the Red Compartida tender was issued, asking him whether SCT could award a sole-source telecommunications contract to an entity called CVG, the predecessor to the Altan Consortium. Mr. Haan advised against awarding a sole-source contract, and instead suggested that SCT issue a public tender for the telecommunications contract. That tender is what became known as the Red Compartida tender.

12. Following the meeting at which Mr. Haan urged (and SCT's vice-minister agreed) that the contract should be offered via a public tender (rather than as a sole source contract), the official within SCT approached Mr. Haan and asked him to "select CVG by the end of the month," notwithstanding the vice-minister's decision to issue a public tender and thus to conduct an open bidding process. Ex. 2, Haan Tr. at 57:2-8. Mr. Haan further testified that CVG was the predecessor to the Altan Consortium, the entity whose bid was selected following SCT's disqualification of Rivada's bid. Ex. 2, Haan Tr. at 58:12-13 (Subsequent to Mr. Haan's testimony, a new company, Altan Redes, which may not be burdened with possession of the records of the Consortium, has appeared in the previously filed §1782 applications.) Mr. Haan

6

also testified that SCT's vice-minister approached him with concerns that an independent contractor was taking funds from the engagement and was using those funds to pay government officials within SCT. Ex. 2, Haan Tr. at 59:21-61:7.

13. Mr. Haan's testimony thus establishes that an official within SCT asked Deloitte to rig a supposedly public bidding process in favor of the predecessor to the Altan Consortium, and further that one of the bids was "essentially a photocopy" of the purportedly confidential Business Model.

### *Bank of America's Dual Roles: Financial Advisor and Bid Evaluator*

14. At the beginning of Red Compartida, Bank of America Merrill Lynch was hired as the Financial Advisor to SCT. Ex. 9 § 17. Bank of America's role as Financial Advisor was to negotiate with domestic and international financial institutions in order to ensure that financing would be available to the winning bidder. Ex. 9 at 49. Under the tender rules, Bank of America was to be paid by the winning bidder, which "must pay directly and fully to the Financial Advisor the total amount of the fees and expenses" established in Exhibit 13 to the tender rules. Under Exhibit 13 and the tender rules, Altan Redes is now obligated to pay $15 million to Bank of America no later than March 16, 2017.

15. In addition to acting as financial advisor to SCT, Bank of America was also contracted by SCT to evaluate the bids submitted in Red Compartida. Richard Keith, a U.S.-based consultant who assisted Deloitte in its development of the Business Model, thereafter assisted Bank of America in its role as bid evaluator. Ex. 3, Keith Tr. at 13:18-22 ("The project scope of my duties for Bank of America Merrill Lynch ... was only to compare the bid materials in a data room -- a secure data room to the RFP."). It was in connection with that engagement by Bank of America that Richard Keith gained access to the bids. *Id.*; Ex. 2, Haan Tr. at 41:21-42:3

("And, subsequently, after Deloitte had served its engagement, at the end of the engagement, [Richard Keith] did work as an independent contractor for another entity serving SCT. Q. So, is that Bank of America? A. Yes.").

### *Sonia Dulá and Luis Cantón Ran Bank of America's Red Compartida Engagement*

16. Sonia Dulá is Vice Chairman for Latin America at Bank of America Merrill Lynch. Luis Cantón is a private secretary to Ms. Dulá. Both Ms. Dulá and Mr. Cantón are based in New York.

17. Ms. Dulá, with Mr. Cantón's assistance, spearheaded both aspects of Bank of America's engagement with SCT. For example, Ms. Dulá maintained constant contact with multiple financial institutions during the bidding process, and Mr. Keith's work efforts in evaluating the bids were turned over to both Ms. Dulá and Mr. Cantón, who were his main contacts at Bank of America. Indeed, Ms. Dulá directly contacted Mr. Keith in late November or early December of 2016, alerting him that Rivada might seek to depose him. Ex. 3, Keith Tr. at 34:7-25. Ms. Dulá and Mr. Cantón are therefore intimately familiar with the manner by which the Red Compartida financial consortium was arranged, as well as the process by which the Altan Consortium bid was selected. And they of course are familiar with the scope of Bank of America's involvement with SCT and Red Compartida.

### *The Evidence Sought from Bank of America, Sonia Dulá, and Luis Cantón*

18. Rivada has reason to believe that SCT's selection of the Altan Consortium bid was secured through improper and perhaps criminal means, both in the selection process and in the coordination of the project's financing. Bank of America, as a contractor to SCT, played an integral role in the financing of Red Compartida as well as in SCT's selection of the Altan Consortium bid. The evidence sought concerning Red Compartida therefore will shed light on

SCT's basis for selecting the Altan Consortium bid and should show the methods by which financing for the project was arranged – issues at the heart of the Mexican Proceedings.

19. Rivada therefore seeks from Bank of America the documents identified in the subpoena attached as Exhibit 4 to the Moscow Declaration. Those documents include the communications, deliverables, and contracts evidencing the various relationships between Bank of America and SCT as well as the roles that Bank of America played in Red Compartida.

20. Rivada also seeks to take testimony and to obtain documents from Ms. Dulá and Mr. Cantón. *See* Exhibits 5-8 to the Declaration of John W. Moscow. Through that testimony and those documents, Rivada seeks to establish the extent of Bank of America's on-the-ground role in Red Compartida, both with regard to the project's financing as well as with regard to the selection of the Altan Consortium bid.

### *The Mexican Proceedings*

21. Rivada has already initiated the Constitutional Appeal, arguing that SCT's disqualification of Rivada's bid was contrary to the Constitution of Mexico. In this proceeding before the federal district court in Mexico, Rivada has the opportunity to present evidence showing improprieties in the Red Compartida process. The federal district court's decisions in the Constitutional Appeal are reviewable up through Mexico's federal judiciary, first by a federal circuit court and then by Mexico's supreme court.

22. In addition to the already pending Constitutional Appeal, Rivada is contemplating civil and other judicial proceedings in Mexico. Through those proceedings, Rivada would seek redress for what was plainly a coordinated attempt to rig the bidding process. Those proceedings will be based upon the multiple irregularities in the Red Compartida tender process – including, importantly, the Altan Consortium's improper use of the Business Model in the preparation of its

9

bid and the SCT official's stated preference for CVG, which strongly suggests that there was improper collusion and that SCT's disqualification of Rivada's bid and selection of the Altan Consortium bid were in violation of Rivada's rights and Mexican law.

***Rivada's Application Should be Granted***

23. Rivada meets all the statutory criteria for the issuance of an order allowing the requested discovery under 28 U.S.C. § 1782. First, Bank of America, Ms. Dulá, and Mr. Cantón are found within this District. Bank of America has a headquarters located in Manhattan, and Ms. Dulá and Mr. Cantón work out of that office. Second, Rivada seeks to use the requested documents and testimony in the Mexican Proceedings – judicial proceedings falling squarely within the statutory requirement of "proceeding[s] in a foreign or international tribunal." Third, the evidence Rivada seeks is crucial to those proceedings, as it is relevant to establishing that the Red Compartida tender process was tainted by collusion, in violation of Rivada's rights. And fourth, Rivada is clearly an "interested person" within the statute, based upon its current and contemplated efforts to seek redress for the injuries it has suffered because of the improprieties in the bidding process.

24. Finally, as set forth in Rivada's Memorandum of Law filed concurrently herewith, all the discretionary factors identified by the Supreme Court likewise favor granting this *ex parte* application. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264-65 (2004) (describing discretionary factors).

25.     Accordingly, Rivada respectfully requests that the Court grant its application for an Order (in the form annexed as Exhibit 10 to the Declaration of John W. Moscow, Esq.) granting leave to serve Bank of America, Sonia Dulá, and Luis Cantón with the subpoenas annexed as Exhibits 4 through 8 to the Declaration of John W. Moscow, Esq.

Dated: February 3, 2017
       New York, NY

BAKER & HOSTETLER LLP

*[signature]*

John W. Moscow, Esq.
45 Rockefeller Plaza
New York, NY 10111
(212) 589-4200
jmoscow@bakerlaw.com

*Attorneys for Petitioner Rivada Networks*

11